UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA                    :

     - v. -                                :

JUAN VICENTE GOMEZ CASTRILLON,              :      S1 05 Cr. 156
    a/k/a "Juanvi,"
GABRIEL CONSUEGRA MARTINEZ,                 :
GABRIEL CONSUEGRA ARROYO,
    a/k/a Ñoño,"                            :
FABIAN DACCARETT YIDI,
PEDRO LEON MALDONADO VELEZ,
JAIME ALBERTO PARADA IBARRA,
KENDY JAIR MARQUEZ DE MOYA,
RAFAEL ALBERTO DAZA,
    a/k/a "Rafa,"
GABRIEL JESUS MIRANDA MARTINEZ,
    a/k/a "Primo,"
FABRICA COLCHITEX,
EDGAR JOSE DE CASTRO DE VIVO,               :
    a/k/a "El Mono,"
    a/k/a "Padrino,"                        :
YONY CURE SABAGH,
EDWARD CARDOSO,                             :
JOSE PILAR LINARES,
ERIC ECHEVARRIA,                            :
JUAN MANUEL HUEZO,
LISA FEBUS,                                 :
MARIO FERNANDEZ,
JOSE RICHARDSON,                            :
LUCY CORREA,
    a/k/a "Gina,"                           :
ANTONIO ESPINAL,
    a/k/a "Jose Paulino Vizcaino,"          :
    a/k/a "Tomas Rosario,"
DENISE CARRILLO DONADO,                     :
CAROLINA APONTE,
GERARDO PALMA,                              :
JUAN CARLOS ELLIS,
SARTO BERTHIAUME,                           :
MIGUEL VALDES,
MAURICIO MIRANDA,                           :
MAVEX CORPORATION,
CARLOS H. OCHOA,                            :
CECILIA CHAVES DE OCHOA,
MAYRA OCHOA,
DAYBREAK CORPORATION,
RAUL HOLGUIN,                               :

**SEALED**
**INDICTMENT**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: APR 1 4 2005

```
FREDDY E. NORIEGA GUTIERREZ,              :
INES M. POLETTI DE NORIEGA,
INVERSIONES NOLETT CA,                    :

                        Defendants.   :
- - - - - - - - - - - - - - - - - - x
```

## COUNT ONE

The Grand Jury charges:

1.  From in or about 2001, up to and including in or about 2005, in the Southern District of New York and elsewhere, JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," GABRIEL CONSUEGRA MARTINEZ, GABRIEL CONSUEGRA ARROYO, a/k/a "Ñoño," FABIAN DACCARETT YIDI, PEDRO LEON MALDONADO VELEZ, JAIME ALBERTO PARADA IBARRA, KENDY JAIR MARQUEZ DE MOYA, RAFAEL ALBERTO DAZA, a/k/a "Rafa," and GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendants, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

2.  It was a part and an object of said conspiracy that JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," GABRIEL CONSUEGRA MARTINEZ, GABRIEL CONSUEGRA ARROYO, a/k/a "Ñoño," FABIAN DACCARETT YIDI, PEDRO LEON MALDONADO VELEZ, JAIME ALBERTO PARADA IBARRA, KENDY JAIR MARQUEZ DE MOYA, RAFAEL ALBERTO DAZA, a/k/a "Rafa," and GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendants, and others known and unknown, would and did distribute a controlled substance, to wit, five kilograms or more

of a substance containing a detectable amount of cocaine,
intending and knowing that such substance would be imported into
the United States from a place outside thereof, in violation of
Sections 959, 960(a)(3) and 960(b)(1)(B)(ii) of Title 21, United
States Code.

3.    It was a further part and an object of said
conspiracy that JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi,"
GABRIEL CONSUEGRA MARTINEZ, GABRIEL CONSUEGRA ARROYO, a/k/a
"Ñoño," FABIAN DACCARETT YIDI, PEDRO LEON MALDONADO VELEZ, JAIME
ALBERTO PARADA IBARRA, KENDY JAIR MARQUEZ DE MOYA, RAFAEL ALBERTO
DAZA, a/k/a "Rafa," and GABRIEL JESUS MIRANDA MARTINEZ, a/k/a
"Primo," the defendants, and others known and unknown, would and
did import into the United States from a place outside thereof a
controlled substance, to wit, five kilograms or more of a
substance containing a detectable amount of cocaine, in violation
of Sections 812, 952(a) and 960(b)(1)(B)(ii) of Title 21, United
States Code.

<u>OVERT ACTS</u>

4.    In furtherance of said conspiracy and to effect the
illegal objects thereof, the following overt acts, among others,
were committed in the Southern District of New York and
elsewhere:

a.    On or about November 1, 2002, other co-
conspirators not named as defendants herein possessed

-3-

approximately $449,000 in narcotics proceeds in New York, New York that were seized by law enforcement officers.

b.   On or about June 4, 2003, other co-conspirators not named as defendants herein possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

c.   On or about July 13, 2003, other co-conspirators not named as defendants herein possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

d.   On or about July 23, 2003, RAFAEL ALBERTO DAZA, a/k/a "Rafa," the defendant, spoke over the telephone in Colombia with JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," the defendant, about a shipment of cocaine.

e.   On or about August 28, 2003, GABRIEL CONSUEGRA ARROYO, a/k/a "Ñoño," the defendant, spoke over the telephone in Colombia with JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," the defendant, about acquiring 250 kilograms of cocaine to be shipped from Colombia.

f.   On or about August 28, 2003, JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," the defendant, spoke over the telephone in Colombia with FABIAN DACCARETT YIDI, the defendant, about transporting cocaine to the United States, Europe, and Puerto Rico.

-4-

g.   In or about October and November 2003, other
co-conspirators not named as defendants herein possessed
approximately 330 kilograms of cocaine -- worth approximately $8
million -- in New York that were seized by law enforcement
officers.

h.   On or about October 10, 2003, GABRIEL
CONSUEGRA MARTINEZ, the defendant, spoke over the telephone in
Colombia with JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," the
defendant, about acquiring cocaine to be shipped from Colombia.

i.   On or about October 25, 2003, KENDY JAIR
MARQUEZ DE MOYA, the defendant, spoke over the telephone in
Colombia with a co-conspirator not named as defendant herein
about sending one ton of cocaine from Colombia to the Caribbean
Islands.

j.   On or about October 31, 2003, a co-conspirator
not named as a defendant herein possessed approximately $630,000
in narcotics proceeds in Miami, Florida.

k.   On or about December 15, 2003, PEDRO LEON
MALDONADO VELEZ, the defendant, spoke over the telephone in
Colombia with a co-conspirator not named as a defendant herein
about a pending shipment of cocaine and providing a sample of the
drugs.

l.   On or about January 26, 2004, JAIME ALBERTO
PARADA IBARRA, the defendant, spoke over the telephone in

-5-

Colombia with PEDRO LEON MALDONADO VELEZ, the defendant, and another co-conspirator not named as a defendant herein about three buyers interested in a cocaine shipment and providing a sample of the drugs.

     m.  On or about March 16, 2004, a co-conspirator not named as a defendant herein possessed a map showing drug-transportation routes from Colombia through the Caribbean Ocean to the United States.

     n.  In or about April 2004, GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendant, spoke with an undercover officer in Miami, Florida about shipments of cocaine and marijuana.

     o.  In or about July 2004, other co-conspirators not named as defendants herein possessed approximately 450 kilograms of cocaine and approximately 3.5 kilograms of heroin -- worth approximately $11.5 million -- in Puerto Rico that were seized by law enforcement officers.

     p.  In or about September 2004, a co-conspirator not named as a defendant herein possessed approximately $1.2 million in narcotics proceeds in Puerto Rico.

     (Title 21, United States Code, Section 963.)

## COUNT TWO

The Grand Jury charges:

5.   From in or about 2001, up to and including in or about 2005, in the Southern District of New York and elsewhere, PEDRO LEON MALDONADO VELEZ, JAIME ALBERTO PARADA IBARRA, and KENDY JAIR MARQUEZ DE MOYA, the defendants, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

6.   It was a part and an object of said conspiracy that PEDRO LEON MALDONADO VELEZ, JAIME ALBERTO PARADA IBARRA, and KENDY JAIR MARQUEZ DE MOYA, the defendants, and others known and unknown, would and did distribute a controlled substance, to wit, one kilogram or more of a substance containing a detectable amount of heroin, intending and knowing that such substance would be imported into the United States from a place outside thereof, in violation of Sections 959, 960(a)(3) and 960(b)(1)(A) of Title 21, United States Code.

7.   It was a further part and an object of said conspiracy that PEDRO LEON MALDONADO VELEZ, JAIME ALBERTO PARADA IBARRA, and KENDY JAIR MARQUEZ DE MOYA, the defendants, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, to wit, one kilogram or more of a substance containing a detectable

-7-

amount of heroin, in violation of Sections 812, 952(a) and 960(b)(1)(A) of Title 21, United States Code.

<u>OVERT ACTS</u>

8.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about November 1, 2002, other co-conspirators not named as defendants herein possessed approximately $449,000 in narcotics proceeds in New York, New York that were seized by law enforcement officers.

b.   On or about June 4, 2003, other co-conspirators not named as defendants herein possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

c.   On or about July 13, 2003, other co-conspirators not named as defendants herein possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

d.   On or about October 31, 2003, a co-conspirator not named as a defendant herein possessed approximately $630,000 in narcotics proceeds in Miami, Florida.

e.   On or about November 9, 2003, KENDY JAIR MARQUEZ DE MOYA, the defendant, spoke over the telephone in

Colombia with a co-conspirator not named as defendant herein about the sale of heroin.

f. On or about March 23, 2004, JAIME ALBERTO PARADA IBARRA, the defendant, spoke over the telephone in Colombia with PEDRO LEON MALDONADO VELEZ, the defendant, about the sale of heroin.

g. On or about March 16, 2004, a co-conspirator not named as a defendant herein possessed a map showing drug-transportation routes from Colombia through the Caribbean Ocean to the United States.

h. In or about July 2004, other co-conspirators not named as defendants herein possessed approximately 450 kilograms of cocaine and approximately 3.5 kilograms of heroin -- worth approximately $11.5 million -- in Puerto Rico that were seized by law enforcement officers.

i. In or about September 2004, a co-conspirator not named as a defendant herein possessed approximately $1.2 million in narcotics proceeds in Puerto Rico.

(Title 21, United States Code, Section 963.)

## COUNT THREE

The Grand Jury charges:

9. From in or about 2001, up to and including in or about 2005, in the Southern District of New York and elsewhere,

RAFAEL ALBERTO DAZA, a/k/a "Rafa," and GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendants, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

10. It was a further part and an object of said conspiracy that RAFAEL ALBERTO DAZA, a/k/a "Rafa," and GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendants, and others known and unknown, would and did distribute a controlled substance, to wit, 1000 kilograms or more of a substance containing a detectable amount of marijuana, intending and knowing that such substance would be imported into the United States from a place outside thereof, in violation of Sections 959, 960(a)(3) and 960(b)(1)(G) of Title 21, United States Code.

11. It was a further part and an object of said conspiracy that RAFAEL ALBERTO DAZA, a/k/a "Rafa," and GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendants, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, to wit, 1000 kilograms or more of a substance containing a detectable amount of marijuana, in violation of Sections 812, 952(a) and 960(b)(1)(G) of Title 21, United States Code.

OVERT ACTS

12.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about November 1, 2002, other co-conspirators not named as defendants herein possessed approximately $449,000 in narcotics proceeds in New York, New York that were seized by law enforcement officers.

b.   On or about June 4, 2003, other co-conspirators not named as defendants herein possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

c.   On or about July 13, 2003, other co-conspirators not named as defendants herein possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

d.   On or about October 31, 2003, a co-conspirator not named as a defendant herein possessed approximately $630,000 in narcotics proceeds in Miami, Florida.

e.   On or about March 16, 2004, a co-conspirator not named as a defendant herein possessed a map showing drug-transportation routes from Colombia through the Caribbean Ocean to the United States.

f.   In or about June 2004, GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendant, and RAFAEL ALBERTO DAZA, a/k/a "Rafa," the defendant, spoke over the telephone in Colombia about the location of a fishing boat transporting approximately 20,000 pounds of marijuana to the United States.

g.   In or about June 2004, co-conspirators not named as defendants herein possessed approximately 20,000 pounds of marijuana -- worth approximately $32 million -- on a fishing boat off the coast of Antigua that were seized by law enforcement officers.

h.   In or about September 2004, a co-conspirator not named as a defendant herein possessed approximately $1.2 million in narcotics proceeds in Puerto Rico.

(Title 21, United States Code, Section 963.)

## COUNT FOUR

The Grand Jury charges:

COLOMBIAN MONEY LAUNDERING AND THE BLACK MARKET PESO EXCHANGE

13.   Colombia is one of the world's primary sources of cocaine, heroin, and marijuana.  Each year Colombian narcotics traffickers generate billions of dollars of narcotics proceeds. In the United States, Canada, and elsewhere outside of Colombia, these narcotics are sold for dollars, almost always in cash, and often in small denominations.

-12-

14.   To profit effectively from this illegal activity, Colombian narcotics traffickers must find a way to "launder" these vast sums of cash, that is, to have the funds transferred to a place and in a form that the narcotics traffickers can use them and in a manner that avoids detection by law enforcement.

15.   Banking laws in the United States and Colombia prevent narcotics traffickers from simply depositing drug monies into accounts in the United States and transferring them to Colombia or other third countries.  As a result, narcotics traffickers must disguise, or "launder," the funds in order to hide their true source.

16.   The Colombian Black Market Peso Exchange (the "BMPE") is one of the primary methods used by Colombian narcotics traffickers to launder their narcotics proceeds.  The basic BMPE scheme typically operates as follows.  In Colombia, a narcotics trafficker owning narcotics proceeds generated in the United States and elsewhere outside of Colombia contacts a third party -- generally referred to as a "peso broker" -- who agrees to exchange Colombian pesos he controls in Colombia for the cash narcotics proceeds in the United States and elsewhere outside of Colombia.  Once this exchange occurs, the narcotics trafficker, having received Colombian pesos in Colombia from the peso broker, has effectively laundered his money and is out of the BMPE process.  The peso broker, on the other hand, must now do

something with the drug dollars that he has acquired outside of Colombia so that he can obtain more pesos to begin the BMPE process again.

17.   To do so, the peso broker uses contacts in the United States and elsewhere outside of Colombia to receive the narcotics trafficker's drug proceeds he purchased, often arranging for criminal associates to receive the drug proceeds in suitcases or bags on the street from the narcotics trafficker's operatives who control the money.  After the money is physically transferred, the peso broker uses additional contacts in the United States to get the drug proceeds into the United States banking system.  To avoid detection, this is often done either through deposits into bank accounts in company or individual names that are intended to appear to be related to legitimate business activity or through multiple deposits of small amounts of drug proceeds into different bank accounts which are then consolidated into larger accounts both in the United States and elsewhere outside of Colombia.  The peso broker, still operating in Colombia, now has a pool of narcotics-derived proceeds in the United States to sell to individuals or companies in Colombia and elsewhere who desire United States dollars.

18.   Persons in Colombia, either individuals or companies, who have pesos to sell -- whether from legitimate sources or not -- and who want to exchange Colombian pesos for

-14-

United States dollars at a favorable exchange rate and in a manner that avoids United States and Colombian currency exchange and income reporting requirements, then purchase the drug dollars from the peso broker.  Once the transaction is completed, the peso broker then uses his contacts in the United States and elsewhere outside of Colombia to transfer the drug proceeds he has accumulated from the narcotics trafficker to wherever the dollar purchaser asks them to be transferred.  Therefore, under the BMPE system, the drug proceeds can and often do end up in the accounts of individuals or companies who appear to have no direct involvement in narcotics-trafficking crimes.

19.  In practice, the BMPE process often involves more than one peso broker:  in many instances, one broker has the direct relationship with the narcotics trafficker in Colombia and bears ultimate responsibility for the laundering of the drug money; a second broker has the criminal associates in the United States and elsewhere outside of Colombia who can collect and accumulate the narcotics proceeds; and a third broker has the contacts with Colombian individuals and companies who want to sell pesos for dollars while avoiding United States and Colombian currency exchange and income reporting requirements. Irrespective of the number of intermediaries involved, however, the result of the BMPE process is the same:  Colombian pesos in

-15-

Colombia are used to buy United States drug dollars in the United States and elsewhere outside of Colombia.

20.   All three key parties involved in the BMPE process benefit:  (a) the narcotics trafficker receives laundered pesos; (b) the dollar purchaser acquires cheap United States dollars while evading currency exchange and income reporting requirements in the United States and Colombia; and (c) the peso broker makes a profit from the difference in the exchange rates he uses to purchase and sell the drug dollars during the unofficial currency exchange process.  Meanwhile, the BMPE process frustrates the efforts of the United States, Colombia, and other governments around the world to enforce their currency exchange and income reporting requirements, to collect taxes, tariffs, and duties owed to them, and to maintain the integrity of their financial institutions.

## THE MONEY LAUNDERING CONSPIRACY

21.   From in or about 2001, up to and including in or about 2005, in the Southern District of New York and elsewhere, JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," RAFAEL ALBERTO DAZA, a/k/a "Rafa," GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," FABRICA COLCHITEX, EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," YONY CURE SABAGH, EDWARD CARDOSO, JOSE PILAR LINARES, ERIC ECHEVARRIA, JUAN MANUEL HUEZO, LISA FEBUS, MARIO FERNANDEZ, JOSE RICHARDSON, LUCY CORREA, a/k/a

-16-

"Gina," ANTONIO ESPINAL, a/k/a "Jose Paulino Vizcaino," a/k/a "Tomas Rosario," DENISE CARRILLO DONADO, CAROLINA APONTE, GERARDO PALMA, JUAN CARLOS ELLIS, and SARTO BERTHIAUME, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to violate Section 1956(a)(1)(B)(i) of Title 18, United States Code.

22. It was a part and an object of the conspiracy that JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," RAFAEL ALBERTO DAZA, a/k/a "Rafa," GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," FABRICA COLCHITEX, EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," YONY CURE SABAGH, EDWARD CARDOSO, JOSE PILAR LINARES, ERIC ECHEVARRIA, JUAN MANUEL HUEZO, LISA FEBUS, MARIO FERNANDEZ, JOSE RICHARDSON, LUCY CORREA, a/k/a "Gina," ANTONIO ESPINAL, a/k/a "Jose Paulino Vizcaino," a/k/a "Tomas Rosario," DENISE CARRILLO DONADO, CAROLINA APONTE, GERARDO PALMA, JUAN CARLOS ELLIS, and SARTO BERTHIAUME, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, the transfer of hundreds of thousands of dollars in cash, represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the

-17-

proceeds of specified unlawful activity, to wit, the proceeds of illegal narcotics transactions, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

<u>MEANS AND METHODS OF THE MONEY-LAUNDERING CONSPIRACY</u>

23.   Among the means and methods by which JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," RAFAEL ALBERTO DAZA, a/k/a "Rafa," GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," FABRICA COLCHITEX, EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," YONY CURE SABAGH, EDWARD CARDOSO, JOSE PILAR LINARES, ERIC ECHEVARRIA, JUAN MANUEL HUEZO, LISA FEBUS, MARIO FERNANDEZ, JOSE RICHARDSON, LUCY CORREA, a/k/a "Gina," ANTONIO ESPINAL, a/k/a "Jose Paulino Vizcaino," a/k/a "Tomas Rosario," DENISE CARRILLO DONADO, CAROLINA APONTE, GERARDO PALMA, JUAN CARLOS ELLIS, and SARTO BERTHIAUME, the defendants, and their co-conspirators would and did carry out the conspiracy were the following.

24.   At all times relevant to this Indictment, JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," RAFAEL ALBERTO DAZA, a/k/a "Rafa," GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," FABRICA COLCHITEX, EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," YONY CURE SABAGH, EDWARD CARDOSO, JOSE PILAR

-18-

LINARES, ERIC ECHEVARRIA, JUAN MANUEL HUEZO, LISA FEBUS, MARIO
FERNANDEZ, JOSE RICHARDSON, LUCY CORREA, a/k/a "Gina," ANTONIO
ESPINAL, a/k/a "Jose Paulino Vizcaino," a/k/a "Tomas Rosario,"
DENISE CARRILLO DONADO, CAROLINA APONTE, GERARDO PALMA, JUAN
CARLOS ELLIS, and SARTO BERTHIAUME, the defendants, conspired to
use the BMPE process in order to launder Colombian drug money in
the United States, Canada, and elsewhere outside of Colombia and
to exchange Colombian pesos for drug dollars while evading
currency exchange and income reporting requirements in the United
States and Colombia.

25. As described below, different members of the
criminal organization played different roles in its money-
laundering activities.  A number of the defendants operated as
narcotics traffickers in Colombia, arranging for the shipment of
millions of dollars worth of drugs from Colombia into the United
States and other countries for distribution.  Other defendants
acted as peso brokers in Colombia, securing contracts from
Colombian narcotics traffickers to launder millions of dollars of
narcotics proceeds in the United States and other countries.
These peso brokers then arranged for the narcotics proceeds to be
picked up from other defendants who served as the Colombian
narcotics traffickers' operatives in the United States, Canada,
and elsewhere outside of Colombia.  After the drug dollars were
picked up and successfully transferred into the United States

-19-

banking system, the peso brokers then made arrangements with Colombian individuals and companies to provide Colombian pesos in Colombia in exchange for the drug money to be wire transferred from bank accounts in the United States into bank accounts owned by the Colombian individuals and companies around the world.  The Colombian dollar purchasers then transferred their Colombian pesos to the peso brokers, who in turn provided the pesos to the Colombian narcotics traffickers to complete the BMPE process. More specifically:

a.  At all times relevant to this Indictment, JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," RAFAEL ALBERTO DAZA, a/k/a "Rafa," and GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendants, among others, were narcotics traffickers in Colombia who arranged for the shipment of drugs from Colombia into the United States and other countries for distribution.

b.  At all times relevant to this Indictment, GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," FABRICA COLCHITEX, EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," and YONY CURE SABAGH, the defendants, were peso brokers based in Colombia who obtained contracts from Colombian narcotics traffickers to launder drug money in the United States and elsewhere outside of Colombia.  These defendants then made arrangements to collect and accumulate the drug money in the United States and elsewhere outside of Colombia so that the cash

-20-

ultimately could be deposited into the United States banking system and laundered through the BMPE.

        c.  At all times relevant to this Indictment, EDWARD CARDOSO, JOSE PILAR LINARES, ERIC ECHEVARRIA, JUAN MANUEL HUEZO, LISA FEBUS, MARIO FERNANDEZ, JOSE RICHARDSON, LUCY CORREA, a/k/a "Gina," ANTONIO ESPINAL, a/k/a "Jose Paulino Vizcaino," a/k/a "Tomas Rosario," DENISE CARRILLO DONADO, CAROLINA APONTE, GERARDO PALMA, JUAN CARLOS ELLIS, and SARTO BERTHIAUME, the defendants, acted as Colombian narcotics traffickers' operatives in the United States and Canada, gathering drug proceeds on the streets and providing them to the peso brokers' criminal associates so the money could be laundered through the BMPE.

<u>OVERT ACTS</u>

        26.  In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

        a.  On or about November 1, 2002, other co-conspirators not named as defendants herein possessed approximately $449,000 in narcotics proceeds in New York, New York that were seized by law enforcement officers.

        b.  On or about March 20, 2003, EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," the defendant, spoke over the telephone in Colombia with GABRIEL JESUS MIRANDA

-21-

MARTINEZ, a/k/a "Primo," the defendant, regarding the collection of drug money in Cali, Colombia.

       c.  On or about March 22, 2003, YONY CURE SABAGH, the defendant, spoke over the telephone in Colombia with GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendant, regarding the collection of illegal proceeds.

       d.  On or about March 25, 2003, LUCY CORREA, a/k/a "Gina," and ANTONIO ESPINAL, a/k/a "Jose Paulino Vizcaino," a/k/a "Tomas Rosario," the defendants, possessed approximately $200,000 in narcotics proceeds in New York, New York.

       e.  On or about April 15, 2003, RAFAEL ALBERTO DAZA, a/k/a "Rafa," the defendant, spoke over the telephone in Colombia with GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendant, regarding the preparation of a drug shipment.

       f.  On or about June 4, 2003, other co-conspirators not named as defendants herein possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

       g.  On or about July 13, 2003, other co-conspirators not named as defendants herein possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

       h.  On or about July 16, 2003, other co-conspirators not named as defendants herein possessed

-22-

approximately $200,000 in narcotics proceeds in New York that were seized by law enforcement officers.

  i. On or about August 13, 2003, JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," the defendant, spoke over the telephone in Colombia with a co-conspirator not named as a defendant herein about the shipment of 100 kilograms of narcotics from Colombia.

  j. On or about August 20, 2003, JOSE RICHARDSON, the defendant, possessed approximately $354,000 in narcotics proceeds in New York, New York.

  k. On or about September 2, 2003, other co-conspirators not named as defendants herein possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

  l. On or about September 4, 2003, other co-conspirators not named as defendants herein possessed approximately $638,000 in narcotics proceeds in New York that were seized by law enforcement officers.

  m. On or about October 31, 2003, CAROLINA APONTE, the defendant, possessed approximately $630,000 in narcotics proceeds in Miami, Florida.

  n. In or about October and November 2003, other co-conspirators not named as defendants herein possessed approximately 330 kilograms of cocaine -- worth approximately $8

-23-

million -- in New York that were seized by law enforcement officers.

o.  On or about November 6, 2003, JUAN CARLOS ELLIS, the defendant, possessed approximately $500,000 in narcotics proceeds in Montreal, Canada.

p.  On or about November 13, 2003, JUAN CARLOS ELLIS and GERARDO PALMA, the defendants, possessed approximately $500,000 in narcotics proceeds in Montreal, Canada.

q.  On or about December 3, 2003, other co-conspirators not named as defendants herein possessed approximately $185,000 in narcotics proceeds in New York that were seized by law enforcement officers.

r.  On or about March 12, 2004, MARIO FERNANDEZ, the defendant, possessed approximately $200,000 in narcotics proceeds in New York, New York.

s.  On or about March 16, 2004, MARIO FERNANDEZ, the defendant, possessed approximately $200,000 in narcotics proceeds in New York, New York.

t.  In or about June 2004, co-conspirators not named as defendants herein possessed approximately 20,000 pounds of marijuana -- worth approximately $32 million -- on a fishing boat off the coast of Antigua that were seized by law enforcement officers.

-24-

u.   In or about June 2004, DENISE CARRILLO DONADO, the defendant, spoke over the telephone in Miami, Florida to another co-conspirator not named as a defendant herein about a wire transfer of approximately $55,000.

v.   In or about July 2004, other co-conspirators not named as defendants herein possessed approximately 450 kilograms of cocaine and approximately 3.5 kilograms of heroin -- worth approximately $11.5 million -- in Puerto Rico that were seized by law enforcement officers.

w.   On or about July 20, 2004, SARTO BERTHIAUME, the defendant, possessed approximately $300,000 in narcotics proceeds in Montreal, Canada.

x.   In or about September 2004, other co-conspirators not named as defendants herein possessed approximately $1.2 million in narcotics proceeds in Puerto Rico that were seized by law enforcement officers.

y.   On or about September 2, 2004, LISA FEBUS, the defendant, possessed approximately $100,000 in narcotics proceeds in New York, New York.

z.   On or about November 8, 2004, JOSE PILAR LINARES and ERIC ECHEVARRIA, the defendants, possessed approximately $500,000 in narcotics proceeds in New York, New York.

-25-

aa.   On or about November 10, 2004, JOSE PILAR LINARES, ERIC ECHEVARRIA, and JUAN MANUEL HUEZO, the defendants, possessed approximately $500,000 in narcotics proceeds in New York that were seized by law enforcement officers.

ab.   On or about January 24, 2005, EDWARD CARDOSO, the defendant, possessed approximately $108,500 in narcotics proceeds in New York, New York.

(Title 18, United States Code, Section 1956(h).)


**COUNTS FIVE THROUGH TEN**

The Grand Jury further charges:

27.   The allegations above describing the BMPE set forth in Paragraphs Five through Twelve are incorporated by reference as if set forth fully herein.

28.   On or about the dates specified in the chart below, in the Southern District of New York and elsewhere, the defendants specified in the chart below, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in a financial transaction, to wit, the transfer of the amount of United States Currency specified in the chart below, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transaction which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of illegal

-26-

narcotics transactions, knowing that the financial transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to wit, the specified defendants transferred United States Currency that constituted the proceeds of illegal narcotics activities to an undercover law enforcement officer in New York, New York.

| COUNT | DATE | DEFENDANT | AMOUNT TRANSFERRED |
|-------|------|-----------|--------------------|
| THREE | 3/25/03 | LUCY CORREA ANTONIO ESPINAL | $200,000 |
| FOUR | 8/20/03 | JOSE RICHARDSON | $354,000 |
| FIVE | 3/12/04 3/16/04 | MARIO FERNANDEZ | $400,000 |
| SIX | 9/2/04 | LISA FEBUS | $100,000 |
| SEVEN | 11/8/04 | JOSE PILAR LINARES ERIC ECHEVARRIA JUAN MANUEL HUEZO | $500,000 |
| EIGHT | 1/24/05 | EDWARD CARDOSO | $108,500 |

(Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)


## COUNT ELEVEN

(Unlicenced Money Transmitting Business)

The Grand Jury further charges:

29.  The allegations above describing the BMPE set forth in Paragraphs Thirteen through Twenty are incorporated by reference as if set forth fully herein.

-27-

## Background

30.  At all times relevant to this Indictment, MIGUEL VALDES and MAURICIO MIRANDA, the defendants, operated and controlled bank accounts in Miami, Florida that received wire transfers of tens of thousands of dollars in narcotics proceeds from GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," and EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," the defendants, and others in Colombia and elsewhere.  VALDES and MIRANDA then arranged for tens of thousands of dollars to be wire transferred from the accounts they operated and controlled in Miami to other accounts in the United States and abroad, thereby causing the narcotics proceeds to be laundered through the BMPE.

31.  At all times relevant to this Indictment, MIGUEL VALDES and MAURICIO MIRANDA, the defendants, conducted their money transmitting business in the United States through their company, MAVEX CORPORATION, the defendant.  MAVEX CORPORATION ("MAVEX") used an address at 7296 NW 44th Street, Miami, Florida.

32.  At all times relevant to this Indictment, MIGUEL VALDES and MAURICIO MIRANDA, the defendants, conducted their MAVEX business through bank accounts opened at Florida branches of Ocean Bank.  VALDES and MIRANDA caused checks to be drawn on and caused interstate and international wire transfers to be received at and made from these accounts, including from and to New York, New York.

-28-

33.   Florida law requires that money transmitters be registered, and it is a felony under Florida law to conduct a money transmitting business without so registering.  MAVEX CORPORATION, the defendant, has never been so registered.  At all times relevant to this Indictment, MIGUEL VALDES and MAURICIO MIRANDA, the defendants, knew that MAVEX had not been registered.

34.   The United States Code and regulations promulgated thereunder require that money transmitters be registered with the federal government.  MAVEX CORPORATION, the defendant, has never been so registered.  At all times relevant to this Indictment, MIGUEL VALDES and MAURICIO MIRANDA, the defendants, knew that MAVEX had not been registered with the federal government.

<u>Statutory Allegation</u>

35.   From on or about October 26, 2001, up to and including on or about January 6, 2004, in the Southern District of New York and elsewhere, MIGUEL VALDES, MAURICIO MIRANDA, and MAVEX CORPORATION, the defendants, unlawfully, willfully, and knowingly did conduct, control, manage, supervise, direct, and own all or part of an unlicenced money transmitting business affecting interstate and foreign commerce (a) without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor and a felony under State law, and (b) failing to comply with the money transmitting business registration requirements under Section 5330 of Title

-29-

31, United States Code, and regulations prescribed under such section.

(Title 18, United States Code, Sections 1960 and 2.)

## COUNT TWELVE

(Unlicenced Money Transmitting Business)

The Grand Jury further charges:

36.   The allegations above describing the BMPE set forth in Paragraphs Thirteen through Twenty are incorporated by reference as if set forth fully herein.

### Background

37.   At all times relevant to this Indictment, CARLOS H. OCHOA, CECILIA CHAVES DE OCHOA, and MAYRA OCHOA, the defendants, operated and controlled bank accounts in Miami, Florida that received wire transfers of tens of thousands of dollars in narcotics proceeds from GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," and EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," the defendants, and others in Colombia and elsewhere.  CARLOS H. OCHOA, CECILIA CHAVES DE OCHOA, and MAYRA OCHOA then arranged for tens of thousands of dollars to be wire transferred from the accounts they operated and controlled in Miami to other accounts in the United States and abroad, thereby causing the narcotics proceeds to be laundered through the BMPE.

-30-

38.   At all times relevant to this Indictment, CARLOS H. OCHOA, CECILIA CHAVES DE OCHOA, and MAYRA OCHOA, the defendants, conducted their money transmitting business in the United States through their company, DAYBREAK CORPORATION, the defendant.  DAYBREAK CORPORATION ("DAYBREAK") used an address at 1054 Creekford Drive, Westin, Florida.

39.   At all times relevant to this Indictment, CARLOS H. OCHOA, CECILIA CHAVES DE OCHOA, and MAYRA OCHOA, the defendants, conducted their DAYBREAK business through bank accounts opened at Florida branches of Republic National Bank. CARLOS H. OCHOA, CECILIA CHAVES DE OCHOA, and MAYRA OCHOA caused checks to be drawn on and caused interstate and international wire transfers to be received at and made from these accounts, including from and to New York, New York.

40.   Florida law requires that money transmitters be registered, and it is a felony under Florida law to conduct a money transmitting business without so registering.  DAYBREAK CORPORATION, the defendant, has never been so registered.  At all times relevant to this Indictment, CARLOS H. OCHOA, CECILIA CHAVES DE OCHOA, and MAYRA OCHOA, the defendants, knew that DAYBREAK had not been registered.

41.   The United States Code and regulations promulgated thereunder require that money transmitters be registered with the federal government.  DAYBREAK CORPORATION, the defendant, has

-31-

never been so registered.  At all times relevant to this
Indictment, CARLOS H. OCHOA, CECILIA CHAVES DE OCHOA, and MAYRA
OCHOA, the defendants, knew that DAYBREAK had not been registered
with the federal government.

Statutory Allegation

42.  From on or about October 26, 2001, up to and
including on or about February 27, 2004, in the Southern District
of New York and elsewhere, CARLOS H. OCHOA, CECILIA CHAVES DE
OCHOA, MAYRA OCHOA, and DAYBREAK CORPORATION, the defendants,
unlawfully, willfully, and knowingly did conduct, control,
manage, supervise, direct, and own all or part of an unlicenced
money transmitting business affecting interstate and foreign
commerce (a) without an appropriate money transmitting license in
a State where such operation is punishable as a misdemeanor and a
felony under State law, and (b) failing to comply with the money
transmitting business registration requirements under Section
5330 of Title 31, United States Code, and regulations prescribed
under such section.

(Title 18, United States Code, Sections 1960 and 2.)

## COUNT THIRTEEN

(Unlicenced Money Transmitting Business)

The Grand Jury further charges:

43.   The allegations above describing the BMPE set forth in Paragraphs Thirteen through Twenty are incorporated by reference as if set forth fully herein.

Background

44.   At all times relevant to this Indictment, RAUL HOLGUIN, the defendant, operated and controlled bank accounts in Miami, Florida that received wire transfers of tens of thousands of dollars in narcotics proceeds from GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," and EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," the defendants, and others in Colombia and elsewhere.   HOLGUIN then arranged for tens of thousands of dollars to be wire transferred from the accounts they operated and controlled in Miami to other accounts in the United States and abroad, thereby causing the narcotics proceeds to be laundered through the BMPE.

45.   At all times relevant to this Indictment, RAUL HOLGUIN, the defendant, conducted his money transmitting business in the United States through his personal accounts in Miami. HOLGUIN used an address of P.O. Box 110781, Miami, Florida for his Miami bank accounts.

-33-

46.  At all times relevant to this Indictment, RAUL HOLGUIN, the defendant, conducted his money transmitting business through bank accounts opened at Florida branches of Bank of America.  HOLGUIN caused checks to be drawn on and caused interstate and international wire transfers to be received at and made from these accounts, including from and to New York, New York.

47.  Florida law requires that money transmitters be registered, and it is a felony under Florida law to conduct a money transmitting business without so registering.  RAUL HOLGUIN, the defendant, has never been so registered.  At all times relevant to this Indictment, RAUL HOLGUIN, the defendant, knew that he had not been registered.

48.  The United States Code and regulations promulgated thereunder require that money transmitters be registered with the federal government.  RAUL HOLGUIN, the defendant, has never been so registered.  At all times relevant to this Indictment, HOLGUIN knew that he had not been registered with the federal government.

## Statutory Allegation

49.  From on or about October 26, 2001, up to and including on or about November 24, 2003, in the Southern District of New York and elsewhere, RAUL HOLGUIN, the defendant, unlawfully, willfully, and knowingly did conduct, control, manage, supervise, direct, and own all or part of an unlicenced

-34-

money transmitting business affecting interstate and foreign commerce (a) without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor and a felony under State law, and (b) failing to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section.

(Title 18, United States Code, Sections 1960 and 2.)

## COUNT FOURTEEN

(Unlicenced Money Transmitting Business)

The Grand Jury further charges:

50.  The allegations above describing the BMPE set forth in Paragraphs Thirteen through Twenty are incorporated by reference as if set forth fully herein.

### Background

51.  At all times relevant to this Indictment, INES M. POLETTI DE NORIEGA and FREDDY E. NORIEGA GUTIERREZ, the defendants, operated and controlled bank accounts in Miami, Florida that received wire transfers of tens of thousands of dollars in narcotics proceeds from GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," and EDGAR JOSE DE CASTRO DE VIVO, a/k/a "El Mono," a/k/a "Padrino," the defendants, and others in Colombia and elsewhere.  POLETTI DE NORIEGA and NORIEGA GUTIERREZ

-35-

then arranged for tens of thousands of dollars to be wire transferred from the accounts they operated and controlled in Miami to other accounts in the United States and abroad, thereby causing the narcotics proceeds to be laundered through the BMPE.

52.  At all times relevant to this Indictment, INES M. POLETTI DE NORIEGA and FREDDY E. NORIEGA GUTIERREZ, the defendants, conducted their money transmitting business in the United States through their company, INVERSIONES NOLETT CA, the defendant.  INVERSIONES NOLETT CA ("NOLETT") used an address at 7141 NW 111th Avenue, Miami, Florida.

53.  At all times relevant to this Indictment, INES M. POLETTI DE NORIEGA and FREDDY E. NORIEGA GUTIERREZ, the defendants, conducted their money transmitting business through bank accounts opened at Florida branches of Ocean Bank.  POLETTI DE NORIEGA and NORIEGA GUTIERREZ caused checks to be drawn on and caused interstate and international wire transfers to be received at and made from these accounts, including from and to New York, New York.

54.  Florida law requires that money transmitters be registered, and it is a felony under Florida law to conduct a money transmitting business without so registering.  INVERSIONES NOLETT CA, the defendant, has never been so registered.  At all times relevant to this Indictment, INES M. POLETTI DE NORIEGA and

FREDDY E. NORIEGA GUTIERREZ, the defendants, knew that NOLETT had not been registered.

55.   The United States Code and regulations promulgated thereunder require that money transmitters be registered with the federal government.   INVERSIONES NOLETT CA, the defendant, has never been so registered.   At all times relevant to this Indictment, INES M. POLETTI DE NORIEGA and FREDDY E. NORIEGA GUTIERREZ, the defendants, knew that he had not been registered with the federal government.

<u>Statutory Allegation</u>

56.   From on or about October 26, 2001, up to and including on or about October 24, 2003, in the Southern District of New York and elsewhere, INES M. POLETTI DE NORIEGA, FREDDY E. NORIEGA-GUTIERREZ, and INVERSIONES NOLETT CA, the defendants, the defendant, unlawfully, willfully, and knowingly did conduct, control, manage, supervise, direct, and own all or part of an unlicenced money transmitting business affecting interstate and foreign commerce (a) without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor and a felony under State law, and (b) failing to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section.

(Title 18, United States Code, Sections 1960 and 2.)

-37-

## FIRST FORFEITURE ALLEGATION

57.  As a result of committing one or more of the controlled substance offenses alleged in Counts One through Three of this Indictment, JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," GABRIEL CONSUEGRA MARTINEZ, GABRIEL CONSUEGRA ARROYO, a/k/a "Ñoño," FABIAN DACCARETT YIDI, PEDRO LEON MALDONADO VELEZ, JAIME ALBERTO PARADA IBARRA, KENDY JAIR MARQUEZ DE MOYA, RAFAEL ALBERTO DAZA, a/k/a "Rafa," and GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," the defendants, shall forfeit to the United States, pursuant to 21 U.S.C. § 853, any and all property constituting and derived from any proceeds that the said defendants obtained directly and indirectly as a result of the said violation and any and all property used and intended to be used in any manner or part to commit and to facilitate the commission of the violation alleged in Counts One through Three of this Indictment including, but not limited to, a sum of money equal to approximately $50 million in United States Currency, representing the amount of proceeds obtained as a result of the controlled substance offenses for which the defendants are jointly and severally liable.

### Substitute Assets Provision

58.  If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

-38-

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property.

(Title 21, United States Code, Sections 963 and 853.)


## SECOND FORFEITURE ALLEGATION

59.   As the result of committing one or more of the money laundering offenses in violation of Title 18, United States Code, Section 1956, alleged in Counts Four through Ten of this Indictment, JUAN VICENTE GOMEZ CASTRILLON, a/k/a "Juanvi," RAFAEL ALBERTO DAZA, a/k/a "Rafa," GABRIEL JESUS MIRANDA MARTINEZ, a/k/a "Primo," FABRICA COLCHITEX, EDGAR JOSE DE CASTRO DE VIVO, a/k/a

"El Mono," a/k/a "Padrino," YONY CURE SABAGH, EDWARD CARDOSO, JOSE PILAR LINARES, ERIC ECHEVARRIA, JUAN MANUEL HUEZO, LISA FEBUS, MARIO FERNANDEZ, JOSE RICHARDSON, LUCY CORREA, a/k/a "Gina," ANTONIO ESPINAL, a/k/a "Jose Paulino Vizcaino," a/k/a "Tomas Rosario," DENISE CARRILLO DONADO, CAROLINA APONTE, GERARDO PALMA, JUAN CARLOS ELLIS, and SARTO BERTHIAUME, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to, a sum of money equal to at least $50 million in United States currency, representing the amount of property involved in the money laundering offenses and traceable to the money laundering offenses.

<u>Substitute Asset Provision</u>

60.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. §

982(b), to seek forfeiture of any other property of said

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1956.)

### THIRD FORFEITURE ALLEGATION

61.  As the result of committing one or more of the

unlicenced money transmitting offenses in violation of 18 U.S.C.

§ 1960 alleged in Count Eleven of this Indictment, MIGUEL VALDES,

MAURICIO MIRANDA, and MAVEX CORPORATION, the defendants, shall

forfeit to the United States, pursuant to 18 U.S.C. § 982, all

property, real and personal, involved in the unlicenced money

transmitting offenses and all property traceable to such

property, included but not limited to a sum of money equal to at

least $5,255,973.40 in United States Currency, representing the

amount of property involved in the unlicenced money transmitting

offenses and traceable to such offenses.

Substitute Asset Provision

62.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due

diligence;

-41-

      (2) has been transferred or sold to, or deposited with, a third person;

      (3) has been placed beyond the jurisdiction of the Court;

      (4) has been substantially diminished in value; or

      (5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

      (Title 18, United States Code, Sections 982 and 1960.)

## FOURTH FORFEITURE ALLEGATION

      63. As the result of committing one or more of the unlicenced money transmitting offenses in violation of 18 U.S.C. § 1960 alleged in Count Twelve of this Indictment, CARLOS H. OCHOA, CECILIA CHAVES DE OCHOA, MAYRA OCHOA, and DAYBREAK, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 982, all property, real and personal, involved in the unlicenced money transmitting offenses and all property traceable to such property, included but not limited to a sum of money equal to at least $7,226,895.35 in United States Currency, representing the amount of property involved in the unlicenced money transmitting offenses and traceable to such offenses.

## Substitute Asset Provision

64.  If any of the above-described forfeitable
property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due
diligence;

(2) has been transferred or sold to, or deposited with,
a third person;

(3) has been placed beyond the jurisdiction of the
Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. §
982(b), to seek forfeiture of any other property of said
defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1960.)

## FIFTH FORFEITURE ALLEGATION

65.  As the result of committing one or more of the unlicenced money transmitting offenses in violation of 18 U.S.C. § 1960 alleged in Count Thirteen of this Indictment, RAUL HOLGUIN, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 982, all property, real and personal, involved in the unlicenced money transmitting offenses and all property traceable to such property, included but not limited to a sum of money equal to at least $571,749.44 in United States Currency, representing the amount of property involved in the unlicenced money transmitting offenses and traceable to such offenses.

### Substitute Asset Provision

66.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

-44-

it is the intent of the United States, pursuant to 18 U.S.C. §
982(b), to seek forfeiture of any other property of said
defendants up to the value of the above forfeitable property.

（Title 18, United States Code, Sections 982 and 1960.)

## SIXTH FORFEITURE ALLEGATION

67.   As the result of committing one or more of the
unlicenced money transmitting offenses in violation of 18 U.S.C.
§ 1960 alleged in Count Fourteen of this Indictment, INES M.
POLETTI DE NORIEGA, FREDDY E. NORIEGA GUTIERREZ, and INVERSIONES
NOLETT CA, the defendants, shall forfeit to the United States,
pursuant to 18 U.S.C. § 982, all property, real and personal,
involved in the unlicenced money transmitting offenses and all
property traceable to such property, included but not limited to
a sum of money equal to at least $3,593,376.70 in United States
Currency, representing the amount of property involved in the
unlicenced money transmitting offenses and traceable to such
offenses.

### Substitute Asset Provision

68.   If any of the above-described forfeitable
property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due
diligence;

-45-

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1960.)

_____   4/14/05        _____
FOREPERSON                                DAVID N. KELLEY
                                          United States Attorney

-46-